OPINIONS OF THE SUPREME COURT OF OHIO
     The full texts of the opinions of the Supreme Court of
Ohio are being transmitted electronically beginning May 27,
1992, pursuant to a pilot project implemented by Chief Justice
Thomas J. Moyer.
     Please call any errors to the attention of the Reporter's
Office of the Supreme Court of Ohio.  Attention:  Walter S.
Kobalka, Reporter, or Deborah J. Barrett, Administrative
Assistant.  Tel.:  (614) 466-4961; in Ohio 1-800-826-9010.
Your comments on this pilot project are also welcome.
     NOTE:  Corrections may be made by the Supreme Court to the
full texts of the opinions after they have been released
electronically to the public.  The reader is therefore advised
to check the bound volumes of Ohio St.3d published by West
Publishing Company for the final versions of these opinions.
The advance sheets to Ohio St.3d will also contain the volume
and page numbers where the opinions will be found in the bound
volumes of the Ohio Official Reports.

Garrett, Appellant and Cross-Appellee, et al. v. City of
Sandusky, Appellee and Cross-Appellant, et al.
[Cite as Garrett v. Sandusky (1994),     Ohio St. 3d     .]
Municipal corporations -- Wrongful death action against city
     for death of child at city-owned wave action pool --
     Immunity from suit under R.C. 2744.01(C)(2)(u) providing
     that "swimming pool" is a "governmental" function -- City
     not immune from suit because a wave pool is not a
     "swimming pool."
     (No. 92-742 -- Submitted May 19, 1993 -- Decided January
12, 1994.)
     Appeal and Cross-Appeal from the Court of Appeals for Erie
County, No. E-91-5.
     On October 30, 1987, Terry Garrett, Sr. ("Mr. Garrett"),
co-administrator of the estate of his son, Terry Garrett, Jr.
("the Garrett child"), filed a wrongful death action against
the city of Sandusky ("the city") in the Court of Common Pleas
of Erie County.  The Garrett child had been found unconscious
at the bottom of Surf's Up Aquatic Center, a city-owned wave
action pool, on June 13, 1987.  He died twenty days later.  In
his complaint, Mr. Garrett alleged that the city, by way of the
negligence of its lifeguards, agents, servants and employees,
proximately caused the Garrett child's death.  Mr. Garrett
further contended that had the city trained the lifeguards to
properly respond to calls for help,  the Garrett child would
not have remained trapped by seventy-five-horsepower blowers on
the bottom of the pool, inhaling water and chemicals.  The
complaint also asserted that the city's flagrant disregard for
the probability that the Garrett child  was in need of rescue
caused the injuries which led to the Garrett child's eventual
death, and caused pain and suffering to Mr. Garrett.
     The city filed a motion to dismiss the complaint, which
was denied on May 16, 1989.  The city then settled the wrongful
death claims of, among others, the Garrett child's mother, Ora
Ott.  Mr. Garrett's claim, however, remained. The matter
proceeded to a jury trial.
     On the first day of the trial, the city stipulated that it
had been negligent and that this negligence was the proximate

cause of the Garrett child's death. On the same day, the city also filed a motion in limine, which included a request to exclude evidence relating to details of the Garrett child's death.

After the trial was conducted on the issue of damages only, the jury awarded Mr. Garrett a verdict of $75,000. The city appealed and Mr. Garrett cross-appealed.

The Court of Appeals for Erie County affirmed the verdict obtained by Mr. Garrett in the trial court, but refused to consider whether the motion in limine had been improperly granted in favor of the city because Mr. Garrett had not properly preserved the issue for appeal.

The cause is now before this court pursuant to the allowance of a motion and cross-motion to certify the record.

Geoffrey L. Oglesby, for appellant and cross-appellee.
Carpenter, Paffenbarger, McGimpsey & Lux and Earl R. McGimpsey, for appellee and cross-appellant.

Per Curiam.     Today we consider whether Mr. Garrett is entitled to pursue his wrongful death action against the city for the losses incurred as a result of his son's death, which the city admits was caused by its own negligence. In order to avoid liability for its negligence at the Surf's Up wave pool, the city relies on R.C. 2744.01(C)(2)(u), formerly 2744.01(C)(2)(t), which states that a "swimming pool" is a "governmental" and not a "proprietary" function, and which the city contends exempts it from liability. This portion of the statute became effective three days before the Garrett child's traumatic episode at Surf's Up.

                              I
Under Ohio law, is the city immune from suit? We conclude that it is not, because a wave pool is not a "swimming pool" pursuant to R.C. 2744.01(C)(2)(u).

R.C. Chapter 2744, with exceptions, immunizes those municipal functions which are classified as "governmental," and exposes to liability those functions classified as "proprietary." The statutory definition of "governmental" functions includes:

"The design, construction, reconstruction, renovation, repair, maintenance, and operation of any park, playground, playfield, indoor recreational facility, zoo, zoological park, bath, or swimming pool or pond, and the operation and control of any golf course[.]" (Emphasis added.) R.C. 2744.01(C)(2)(u).

In the present case, the Surf's Up Aquatic Center operated by the city was not merely a "swimming pool." The wave activation device at this facility materially transformed the pool from a placid body of water, commonly known as a swimming pool, to a potentially hazardous body of churning water. A wave pool is more akin to an amusement ride, which is not an immunized municipal function according to R.C. Chapter 2744. We, therefore, affirm the judgment of the court of appeals on this issue.

                              II
In his proposition of law, Mr. Garrett claims that the trial court improperly granted a motion in limine, which in part requested the court to exclude all evidence relating to

the details of the Garrett child's death.

While the record of this case creates serious doubts about the extent to which the city's motion in limine was actually granted, for purposes of this opinion, we assume it was granted in full. Even under this assumption, however, the granting of this motion alone does not constitute a final appealable order.

In State v. Grubb (1986), 28 Ohio St.3d 199, 28 OBR 285, 503 N.E.2d 142, we held that "it is incumbent upon a [party] who has been temporarily restricted from introducing evidence by virtue of a motion in limine, to seek the introduction of the evidence by proffer or otherwise in order to enable the court to make a final determination as to its admissibility and to preserve any objection on the record for purposes of appeal." Id. at paragraph two of the syllabus.

Because the record indicates that the appellant failed to proffer any evidence allegedly excluded by the trial court, Mr. Garrett has waived his right to argue this evidentiary issue on appeal.

Judgment affirmed.

A.W. Sweeney, Douglas, Wright, Resnick, F.E. Sweeney and Pfeifer, JJ., concur.

Moyer, C.J., dissent.

Pfeifer, J., concurring. While I agree that Mr. Garrett is entitled to pursue his wrongful death action against the city for the losses incurred as a result of his son's death, I would have held that the city cannot avoid liability for its negligence at the Surf's Up wave pool because the statute relied upon, R.C. 2744.01(C)(2)(u), formerly 2744.01(C)(2)(t), violates Section 16, Article I of the Ohio Constitution, and is thus unenforceable.

Section 16, Article I of the Constitution of Ohio, which establishes a right to bring suits against the state, has an interesting and long-ignored history. Section 16 provides:

"All courts shall be open, and every person, for an injury done him in his land, goods, person, or reputation, shall have remedy by due course of law, and shall have justice administered without denial or delay.

"Suits may be brought against the state, in such courts and in such manner, as may be provided by law." (Emphasis added.)

I

In 1975, the state of Ohio "waived" its immunity from suit by enacting R.C. Chapter 2743, the Court of Claims Act. 135 Ohio Laws, Part II, 869. Political subdivisions fell outside this waiver of immunity. Burr v. Stark Cty. Bd. of Commrs. (1986), 23 Ohio St.3d 69, 72, 23 OBR 200, 203, 491 N.E.2d 1101, 1105.

In 1982, this court belatedly recognized the great potential for injustice which resulted from the doctrine of sovereign immunity. Haverlack v. Portage Homes, Inc. (1982), 2 Ohio St.3d 26, 2 OBR 572, 442 N.E.2d 749. The Haverlack court abrogated the doctrine of sovereign immunity for political subdivisions to the extent it was rooted in the common law. Id. at 30, 2 OBR at 575, 442 N.E.2d at 752. The court commented:

"Stare decisis alone is not a sufficient reason to retain the doctrine which serves no purpose and produces such harsh results." Id.

In an effort to contain the implications of Haverlack, the General Assembly enacted R.C. Chapter 2744 in 1985. Am.Sub.H.B. No. 176, 141 Ohio Laws, Part I, 1699. These statutes attempt to define the extent to which political subdivisions can be sued rather than defining the manner and courts where actions could be brought. The statutes, with exceptions, exempted political subdivisions from liability for losses resulting from the exercise of "governmental" functions while exposing them to liability for the negligent exercise of "proprietary" functions. In 1987, the General Assembly, when it enacted Am.Sub.H.B. No. 295, hurriedly sought to blanket historically proprietary functions, such as swimming pools and golf courses, with immunity. See 142 Ohio Laws, Part II, 3250-3253.

In light of the original intent of the delegates to the Constitutional Convention of 1912 and the plain reading of Section 16, Article I of the Ohio Constitution, the remaining vestiges of local governmental immunity should be abolished. The General Assembly remains empowered to establish the manner that suits may be brought against the political subdivisions, and may select the appropriate courts for these suits.

## II

Upon examining the proceedings and debates from the Constitutional Convention of 1912, it is clear that Section 16, Article I of the Constitution was originally intended to abolish the doctrine of sovereign immunity on its own. Legislation was not intended to be indispensable to effect this result. The sole sponsor of the amendment, B. F. Weybrecht, repeatedly indicated that the provision, once adopted, would end sovereign immunity. In describing the amendment, he stated:

"The proposal, which has been recommended by the Judiciary committee, recognizes the right of the individual to seek redress for claims against the state in such courts as may hereafter be designated, without petitioning the legislature as is now the custom." 2 Proceedings and Debates of the Constitutional Convention of the State of Ohio (1912) 1431.

According to those who drafted it, the amendment was intended to preempt the General Assembly's authority to regulate the parameters of sovereign immunity. Weybrecht noted:

"***I believe that the proposal is eminently a constitutional question, and not, as in the case of Virginia and North Carolina, a proper subject for legislative enactment.

"It will no doubt, be argued that the citizen has now, and always has had, the right to submit his grievance to the legislature, and supplicate that body for the privilege of making the state a party to a suit in some court in which he might judicially establish his claim.

"*** In this method of disposing of such claims we might well ask the question, Why should the state demand of her citizenship a certain line of conduct in the settlement of disputes between individuals, partnerships or corporations, and hold herself aloof from the operation of her own laws?***

"***

"***Let the humblest citizen feel that while the state can impose on him all the duties of citizenship, taxation, obedience to law and the common defense, he is the equal of the sovereign before the law." 2 Proceedings and Debates, supra, at

1431.

These remarks made by delegate Weybrecht confirm that after the constitutional convention passed the amendment to Section 16, Article I, and it was adopted by the electorate, the General Assembly could no longer abrogate sovereign immunity because the amendment had already done so.

When the amendment, as adopted, was read to the constitutional convention, delegate Samuel A. Hoskins inquired:

"Does this convey the idea that legislation is necessary to confer that right, or is the right given by this article itself? I don't think the latter part is clear. The amendment says that the legislature shall provide the method of bringing suit. Will the amendment itself confer the right to bring the suit?" 2 Proceedings and Debates, supra, at 2028.

In response to this question, delegate Hiram D. Peck noted:

"The amendment does confer that right." Id.

This discussion by other delegates at the convention confirms that the right to sue the state was conveyed to Ohioans in the amendment, and that the legislature was to have no role in determining the scope of this right.

The actual wording of the amendment expresses the intent of the delegates who enacted it. The General Assembly is responsible for determining the appropriate "courts" in which suits against the state are to be filed, and it must design the "manner," or procedures, for plaintiffs to follow in these courts. Nowhere in the provision does it say that the General Assembly shall determine what causes of action can be brought against the state. Thus, the true intent of the amendment to Section 16, Article I was to abolish sovereign immunity in its entirety.

This true meaning has been ignored by Ohio case law, but should be acknowledged today. Governmental immunity, including municipal immunity, is contrary to the clear meaning and mandate of the Ohio Constitution.

Moyer, C.J., dissenting. I respectfully dissent from the majority's decision that the city's wave action pool was not a swimming pool but, rather, an amusement ride. I find the majority's result to be inconsistent with legislative pronouncements on the subject. This court's ultimate goal must be to give effect to the General Assembly's intent and not to our own opinion.

Three days prior to the tragic accident at issue, the General Assembly amended R.C. 2744.01 to include swimming pools as governmental functions subject to sovereign immunity. While the term "swimming pool" is not defined within R.C. Chapter 2744, other similar but independent legislative enactments evidence a recognition that a wave action pool is but one type of swimming pool the municipal operation of which is immune from suit.

After R.C. 2744.01 was amended, the General Assembly enacted R.C. Chapter 3749, concerning swimming pools. R.C. 3749.01(G) defines "public swimming pools" as:

"'Public swimming pool' means any indoor or outdoor structure, chamber, or tank containing a body of water for swimming, diving, or bathing that is intended to be used collectively for swimming, diving, or bathing ***."

R.C. 3749.01(I) defines a "special use pool" as a "public

swimming pool containing *** wave generating equipment ***." Therefore, the General Assembly has explicitly defined pools such as Sandusky's to be swimming pools in other contexts. The same reasoning is applicable here.

In the Ohio Administrative Code, the result is the same. Ohio Adm. Code 3701-31-01(Q) defines "special use pool" as a public swimming pool equipped with a wave generating device. Additionally, the General Assembly has given local boards of health and general health districts licensing authority over swimming pools, whereas licensing authority over amusement rides has been delegated to the Department of Agriculture. R.C. 1711.53(A)(1). The only time the Department of Agriculture may license swimming pools is when they are part of a larger amusement facility. R.C. 3749.01(I). This was done apparently for administrative convenience to eliminate dual licensing requirements for such operations.

Construction of Sandusky's wave action pool was approved by the Ohio Department of Health in accordance with Ohio Adm.Code 3701-31-02 and 3701-31-03. Likewise, the swimming pool's permit to operate was granted by the Erie County Health District.

The majority ignores both statutory and administrative definitions of swimming pools when it concludes that Sandusky's pool is not a pool. Anyone who has raised a child in the last ten years has experienced the burgeoning popularity of water parks. Many of these attractions come complete with water slides, wave pools, amusement rides and carnival games. To anyone who has visited such a facility, the distinction between the pool attractions and the amusement attractions is readily apparent. The pool in question is a freestanding pool that serves the sole purpose of providing the citizens of Sandusky, many of whom have no access to a private or club pool, a place to swim.

It is my belief that the ordinary use of the term "swimming pool" includes a wave action pool and, more important, all indications lead to the conclusion that the General Assembly intended those pools to come under the recognized definition of a public "swimming pool."

Because I conclude that the city of Sandusky was immune from suit, I would not reach the issue raised by Garrett's appeal.